4/18/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| SAIDE LUGO, | B324368 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. 22STCV17590 |
| v. | |
| PIXIOR, LLC, et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Mark V. Mooney, Judge. Reversed.

Ross, Peter W. Ross, Ira G. Bibbero; Farivar Law Firm, Fahim Farivar, Brian Ning and Catherine Y. Jung for Defendants and Appellants.

Binder and Kalioundji, David S. Binder and Zena M. Kalioundji for Plaintiff and Respondent.

_____

Saide Lugo sued former employer Pixior, LLC and some of its employees for malicious prosecution. Lugo claimed Pixior had falsely reported her to police, which triggered a criminal

prosecution against her that she defeated.  In response to the malicious prosecution lawsuit, Pixior defendants filed a special motion to strike, which the trial court erroneously denied.  As a matter of law, Pixior had a winning defense:  criminal prosecutors acted only after an *independent* investigation.  It was error to deny Pixior's motion.

Factually, the parties are at loggerheads.

According to Pixior, Lugo was a disgruntled employee who quit in a huff and, on her way out, spitefully deleted Pixior's valuable computer files.

According to Lugo, Pixior invented specious charges, hoping to make her look bad because her whistleblowing was about to help Pixior's foe in an impending dispute.

The parties agree, however, that Pixior complained to police, who arrested and charged Lugo.  They also agree Lugo ultimately avoided criminal liability:  Lugo's criminal defense attorney discovered a Pixior employee lied under oath at the preliminary hearing.  This tainted witness's testimony was vitally significant:  the damage to it convinced the prosecutor to dismiss the whole case against Lugo as unprovable.  The trial court declared Lugo factually innocent.

A prosecutor nonetheless made remarks Pixior says showed his continued belief in Lugo's actual, but unprovable, culpability.  Lugo contests this interpretation.

In any event, Lugo then sued Pixior and some of its employees for malicious prosecution.  The trial court denied the defense's special motion to strike.

Our independent review follows familiar standards for anti-SLAPP analysis.  (E.g., *Serova v. Sony Music Entertainment* (2022) 13 Cal.5th 859, 871–872.)

The trial court rightly found Pixior's special motion to strike satisfied the first step in anti-SLAPP analysis, which is whether Lugo's lawsuit called forth the statute's protection. The court concluded her complaint for malicious prosecution concerned protected activity.

This correct conclusion applied the usual rule: helping to bring about a criminal prosecution is protected activity under the statute. (See *Dickens v. Provident Life & Accidents Ins. Co.* (2004) 117 Cal.App.4th 705, 707, 713–717 [a malicious prosecution action predicated upon a defendant's alleged participation in procuring a criminal prosecution against a plaintiff falls within the ambit of the anti-SLAPP statute] (*Dickens*).)

Lugo argues this conclusion was wrong because the statute does not apply to *false* statements to police.

Lugo's authority is *Lefebvre v. Lefebvre* (2011) 199 Cal.App.4th 696, 701 (*Lefebvre*), which involved an extraordinary act by a jury, which prompted the trial court to conclude the record there "conclusively" showed complainants had engaged in illegal activity by reporting a man to police. The complaint to police was that this man had threatened to kill his wife and children. A jury exonerated the man of these accusations. He turned around and sued his accusers for malicious prosecution. The defense filed a special motion to strike, which the trial court denied. The appellate court affirmed this denial. (*Id.* at p. 700.)

The extraordinary act in *Lefebvre* was the jury's remarkable and indeed unprecedented post-verdict written statement: "We, the jury, believe that *the absence of any real investigation by law enforcement is shocking* and we agree that this appears to follow a rule of guilty until proven innocent.

3

There was no credible evidence supporting the indictment. We believe prosecuting this as a crime was not only a waste of time, money, and energy, for all involved, but is an affront to our justice system. This jury recommends restitution to the defendant for costs and fees of defending himself against these charges. This jury requests that our collective statement be made available in any [future] legal action relating to these parties." (*Lefebvre, supra*, 199 Cal.App.4th at p. 700, italics added.)

The trial court evidently thought this unprecedented jury utterance "conclusively" demonstrated those accusing the man had engaged in "illegal activity." (*Lefebvre, supra*, 199 Cal.App.4th at p. 701.)

This case has no extraordinary element. Nothing conclusively shows Pixior broke the law. No independent fact finder has declared "the absence of any real investigation by law enforcement is shocking." (*Lefebvre, supra*, 199 Cal.App.4th at p. 700.)

The usual rule thus applies: a malicious prosecution action predicated upon a defendant's alleged participation in procuring a criminal prosecution against a plaintiff falls within the ambit of the anti-SLAPP statute. (*Dickens, supra*, 117 Cal.App.4th at p. 707.)

The trial court was right to rule Pixior's motion satisfied the first step of anti-SLAPP analysis.

We move to the second step, and here the trial court went astray. This second step required Lugo to demonstrate a probability of success. In this summary-judgment-like process, courts do not weigh evidence or resolve conflicting factual claims. Instead they evaluate whether plaintiffs like Lugo have produced

4

evidence to support legally sufficient claims. Accepting that evidence as true, courts decide whether the motion defeats the plaintiff's claims as a matter of law. The motion fails if the lawsuit has minimal merit. (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 788.)

Lugo failed utterly to defeat Pixior's air-tight defense that, before the district attorney filed charges, police conducted an investigation that was independent of Pixior. Therefore the decision to prosecute Lugo was a superseding cause that insulated Pixior from liability, as a matter of law.

A separate investigation that is independent protects a complainant from liability for malicious prosecution. (*Werner v. Hearst Publications, Inc.* (1944) 65 Cal.App.2d 667, 670–673.)

Lugo accepts this basic rule but argues the prosecutors' investigation in her case was not truly independent. Lugo claims the detective testifying at the preliminary hearing in the underlying case relied "almost entirely" on false statements from four Pixior employees. Lugo asserts the prosecutors showed no independence but were simply slothful pawns of Pixior. (See *Miley v. Harper* (1967) 248 Cal.App.2d 463, 468–469 ["For all we know the only thing that the investigator did was to talk to [the complainant], which of course, would not be an 'independent' investigation."].)

Contrary to Lugo's argument, undisputed facts in Lugo's own evidence show the police investigation was fully independent.

The sheriff's office received a report of criminal conduct in May 2018. In June 2018, detective Samuel Taylor interviewed employees at the Pixior office in Commerce, California. The following month, Taylor served a search warrant at Lugo's home.

Taylor was looking for shipping documents and digital evidence he suspected Lugo might possess.

Taylor alerted two other detectives, who arrested and booked Lugo. They also seized her phone and flash drive.

Taylor mirandized Lugo, who agreed to speak without a lawyer.

In this interrogation, Taylor quizzed Lugo about her version of events. Taylor found Lugo so convincing that he decided to release her on the spot, which is hardly the standard outcome of a police interview after an arrest.

Taylor wrote in a report that he chose to let Lugo go under section 849(b)(1) of the Penal Code, which authorizes an officer's release of an arrestee when "[t]he officer is satisfied that there are insufficient grounds for making a criminal complaint against the person arrested."

Taylor wrote he would "follow up with Pixior regarding the information [Lugo] provided in the interview . . . ." Taylor decided "to continue the investigation."

Taylor obtained Lugo's work computer from a Pixior employee and took it to the Homeland Security Digital Forensics Lab, where he gave it to Special Agent Aaron Kwon for analysis. Kwon gave Taylor the results of his analysis. On October 29, 2018, Taylor wrote a supplementary report recounting his further investigation.

Taylor interviewed more Pixior employees. He authorized a search warrant of Lugo's phone and flash drive on October 12, 2018. Taylor "parse[d] through the vast amounts of data located on the phone." Nothing on the phone seemed to refer to deleting data, and Taylor could not find anything significant on the flash drive.

But Taylor did find a possibly relevant message from Pixior security guard Jose Montalvo. Taylor contacted Montalvo and asked about the message. Taylor also made another inquiry based on the phone data.

Later in October, Taylor obtained an updated loss estimate from Pixior.

In writing, Taylor summarized his personal impressions of the case, as follows. Lugo was a Pixior employee who quit after an argument with another employee. Montalvo saw Lugo delete items from her computer and take files when she left. Lugo's co-worker had heard Lugo joke about deleting data if she left Pixior. Another co-worker recalled a similar incident with Lugo at their previous employment. Pixior's information technology technician said he could testify about who deleted what data.

Taylor concluded his report by writing the "case will be forwarded to the district attorney's office for filing consideration." That office then filed a criminal complaint against Lugo for deleting data.

As a matter of law, this investigation was independent of Pixior.

The detective did receive information from Pixior, certainly. But investigations commonly begin by interviewing the ostensible victim, because crime victims usually know something about the crime. This does not negate independence.

After Pixior's report of what it claimed was Lugo's criminal activity, the initiative and discretion governing the investigation resided entirely with the Los Angeles Sheriff's Department. No facts showed the detective was Pixior's cat's paw.

Lugo's claim the detective was the dupe of Pixior is contrary to Lugo's own evidence. The independent investigation

defense completely shielded the Pixior parties from liability, meaning the special motion to strike had merit and must end this lawsuit.

## DISPOSITION

We reverse the order and award costs to the appellants.


WILEY, J.

We concur:


GRIMES, Acting P. J.


VIRAMONTES, J.


8